# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
## *Southern Division*

| | | |
|---|---|---|
| **Diane Reynolds,** *on behalf of herself and all others similarly situated*, | * | |
| | * | |
| Plaintiff, | | |
| v. | * | Case No.:  8:25-cv-01318-PX |
| **Athena Bitcoin, Inc.,** | * | **TRIAL BY JURY IS DEMANDED** |
| Defendant. | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

## AMENDED CLASS ACTION COMPLAINT

1.	Plaintiff Diane Reynolds, on behalf of herself and all other similarly situated individuals, alleges as follows for her Amended Class Action Complaint against Athena Bitcoin, Inc. ("Athena").

## PRELIMINARY STATEMENT

2.	Athena operates Bitcoin Automatic Teller Machines ("Bitcoin ATMs" or "BTMs"), which are free-standing kiosks akin to traditional ATMs.

3.	BTMs allow consumers to exchange fiat currency, like United States Dollars, for Bitcoin, which is digital "money."

4.	Bitcoin is stored in a digital "wallet" that serves the same function as a bank account but without the oversight or security provided by a financial institution.

5.	Although Bitcoin has value, Athena does not sell Bitcoin at or even close to the prices at which Bitcoin can be purchased on common exchanges like Coinbase.

6.	Athena instead sells Bitcoin at prices that far exceed the asset's value at any given time. Plaintiff, for example, paid Athena $13,100 for 0.14538544 Bitcoin on July 29, 2024.

7.      Although Plaintiff paid more than $90,000 per one Bitcoin (prorated to her purchase amount), the value of one Bitcoin on July 29, 2024 was only $66,819.91.[1]



| Date | Open | High | Low | Close ⓘ | Adj Close ⓘ | Volume |
|---|---|---|---|---|---|---|
| Jul 30, 2024 | 66,819.05 | 66,987.67 | 65,323.19 | 66,201.02 | 66,201.02 | 31,380,492,109 |
| Jul 29, 2024 | 68,259.05 | 69,987.54 | 66,532.59 | 66,819.91 | 66,819.91 | 40,780,682,628 |

8.      In other words, Athena added about a 35% markup, functionally a service fee, to Plaintiff's purchase that Athena calls its "Transaction Service Margin."

9.      Even with an exchange fee structure that is so unfriendly to its users,[2] Athena has carved out a place in the cryptocurrency marketplace because consumers are often convinced to use BTMs at the direction of fraudsters.

10.     Fraudsters are not dissuaded by exorbitant fees that are paid by their victims, as evidenced by the volume of fraud involving Athena BTMs.

11.      In a lawsuit filed by the District of Columbia during the pendency of this action, it was alleged that "[m]ost deposits to Athena BTMs in the District [of Columbia] . . . are the product of outright fraud."[3]

---

[1] Yahoo! Finance, *Bitcoin USD Price (BTC-USD)*, https://tinyurl.com/53npkjxb (July 29–20, 2024).

[2] District of Columbia Office of the Attorney General, *Attorney General Schwalb Sues Crypto ATM Operator for Financially Exploiting District Residents* (Sept. 8, 2025), https://oag.dc.gov/sites/default/files/2025-09/Athena%20Complaint.pdf ("Athena BTMs charge District consumers fees of up to 26% per transaction without clearly disclosing them at any point in the process. Bitcoin purchased through other apps and exchanges typically have fees of 0.24% to 3%.").

[3] D.C. Complaint ¶ 1, https://oag.dc.gov/sites/default/files/2025-09/Athena%20Complaint.pdf.

12.     The District of Columbia further asserted that "Athena's machines are primarily used to facilitate fraudulent schemes that exploit the elderly and result in huge sums of money being transferred directly to scammers."[4]

13.     These claims are not novel.

14.     In fact, Athena has been on notice of its use as an instrumentality of fraud for several years, openly acknowledging since at least 2018 that its BTMs have posed a high risk of being used as instrumentalities for impersonation scams, including against elders.

15.     Notwithstanding that notice, Athena's BTMs continue to exist as instrumentalities of fraud because fraudulent schemes are of great value to Athena.

16.     In Plaintiff's case, Athena retained approximately 35% (about $4,500) of Plaintiff's $13,100 purchase price. The fraudster, meanwhile, absconded with the .014538544 in Bitcoin that Athena provided in exchange for the purchase price.

17.     Plaintiff had no idea that Athena was profiting from her purchase of Bitcoin, much less to such an extreme degree.

18.     Plaintiff's understanding was caused by Athena's representations and omissions.

19.     First, Athena's fee was not clearly disclosed by the BTM.

20.     Athena's only conceivable disclosure was a confusing and misleading reference to a "Transaction Service Margin" in its lengthy digital Terms of Service.

21.     That disclosure was embedded within a more-than-seven-hundred-word wall-of-text in the scrollable Terms of Service presented on BTM's digital interface.

22.     And, upon information and belief, it merely stated:

A margin (the difference between the market price and the actual selling or buying price at the kiosk) will be assessed on your purchase or sale of cryptocurrencies in

---

[4] *Id.* ¶ 2.

an amount disclosed to you at the time you make the offer to purchase or sell cryptocurrency.

23. That mere reference to a confusing and ambiguous term failed to disclose to Plaintiff the magnitude of the margin or that it was functionally a transaction fee.

24. Second, the Terms of Service falsely claimed that the extent of the Transaction Service Margin would be disclosed at the time of purchase.

25. Athena never disclosed the margin or fee to Plaintiff.

26. In order to determine the margin, Plaintiff would have needed to independently compare the spot price of Bitcoin to the "exchange rate" charged at the BTM.

27. And third, the Terms of Service otherwise presented a misleading example:

For example, in the context of a purchase transaction, if you tender a $100 bill and the Transaction Service Margin is $4, the Transaction Service Margin will be assessed and deducted from the $100 and the remaining $96 will be used to calculate the quantity of any cryptocurrencies purchased by you at the quoted price.

28. Of course, in Plaintiff's situation, the Transaction Service Margin was not a flat fee taken prior to the purchase as intimated by the Terms of Service.

29. Rather, it was a fee hidden within the quoted price.

30. Not only that, but Athena's example grossly undersold the magnitude of the fee that Athena actually charged Plaintiff.

31. Plaintiff was not otherwise told that she would receive significantly less in Bitcoin than the value of the cash she had exchanged.

32. As a result, Plaintiff had no reason to know that Athena was keeping more than one third of her money.

33. As a consequence, Plaintiff maintained her belief that, by purchasing Bitcoin, she was *securing her money* and protecting it from hackers.

4

34. Had Plaintiff known that Athena was retaining so much of her hard-earned money, she would not have followed through with the transaction.

35. Athena's failure to disclose was material. Indeed, it is substantially likely that most unsophisticated consumers would not use Athena's BTMs if they knew about the massive fee baked into the represented price of Bitcoin.

36. Making matters worse, even after Athena became aware that Plaintiff was the victim of a scam, Athena refused to reimburse her, including the significant portion of the purchase price that it retained.

37. Upon information and belief, when Athena becomes aware that one of its BTMs was used to perpetrate fraud—and that Athena, in turn, profited greatly at the expense of a customer—Athena rejects reimbursement on the basis that the customer was defrauded not by it, but by a third party.

38. Upon information and belief, Athena invariably retains some, if not all, of its profits.

39. By overcharging Plaintiff for Bitcoin in the absence of meaningful disclosure of that fee, Athena engaged in an "unfair, abusive, or deceptive trade practice . . . in . . . [t]he sale of . . . consumer goods . . . or consumer services," in violation of the Maryland Consumer Protection Act ("MCPA"). Md. Code, Com. Law § 13-303(1).

40. Athena omitted information about its "Transaction Service Margin," an omission that tends to deceive and that was made so Plaintiff would "rely on [it] in connection with: . . . [t]he promotion or sale of any . . . consumer service." *Id.* §§ 13–301(3), (9).

41. Because Athena did so systematically, Plaintiff asserts an MCPA claim on behalf of a class of similarly situated Maryland consumers.

42.     Plaintiff and the class members are entitled to damages for any injury or loss caused by Athena's violations, as well as their reasonable attorneys' fees. *Id.* § 13-408(a)–(b).

43.     Plaintiff additionally asserts a class claim for concealment and seeks compensatory damages and punitive damages, the latter based on Athena's intentional decision to omit reference to the excessive fee that it charges—a fee that is only made practicable by Athena's willingness to ignore the fraudulent schemes from which it benefits.

44.     Finally, Plaintiff alleges a class claim on behalf of Maryland class members aged 68 or older for violations of Mayland Stop Adult Financial Exploitation (SAFE) Act.

45.     Athena financially exploited Maryland elders by failing to disclose its excessive transaction fees while in a position of trust and confidence per the parties' agreement and because Athena handled Plaintiff's and the class members' funds for the purpose of a purported exchange.

## JURISDICTION AND VENUE

46.     This Court has jurisdiction under 28 U.S.C. § 1332(d) because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which Plaintiff and Athena are citizens of different states.

47.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because Plaintiff resides in this District and Division, and a substantial part of the events giving rise to Plaintiff's claims occurred here.

## PARTIES

48.     Plaintiff Diane Reynolds is a resident of Montgomery County, Maryland. She is a "consumer" as defined by the MCPA, Md. Code, Com. Law § 13-101(c)(1).

49.     Defendant Athena Bitcoin, Inc. is a Delaware corporation headquartered in Illinois. Athena is a "merchant" as defined by the MCPA, Md. Code, Com. Law § 13-101(g)(1).

## FACTS

### *The Use of Athena BTMs in Fraud Schemes*

50.     Athena BTMs allow customers to exchange physical currency, like United States Dollars, for cryptocurrency or other digital assets.

51.     Customers select the type of cryptocurrency that they wish to purchase, and the BTM scans a QR code from the customer's (often a fraud victim) phone.

52.     The customer then inserts cash into the machine, bill by bill.

53.     According to a recent SEC filing, "Athena Bitcoin transactions are broadcast within 15 minutes from the time you finish at the ATM."





54.    BTMs are a preferred tool for fraudsters because they offer speed, anonymity, cross-border functionality, and irreversibility of cash-to-crypto transactions

55.    The median reported loss per scam involving a BTM is $10,000, compared to $447 for fraud more generally.

56.    Losses are greater because fraudsters are able to take advantage of the BTM industry's lack of mandatory transaction holds, minimal fraud screening, and weak internal consumer protections.

57.    Fraudsters do not select BTM providers randomly.

58.     They direct victims to specific operators, favoring those with lenient security measures and weak fraud prevention protocols.

59.     Athena has played a major role in the BTM fraud crisis, operating thousands of BTMs worldwide, including several in the State of Maryland.

60.     The D.C. attorney general reported several months ago that Athena's kiosks in neighboring Washington D.C. averaged $4,592 per transaction.

61.     Athena, of course, is aware of its involvement in fraud schemes.

62.     On its website at or around the time this case was filed, Athena published a section titled "Avoid these Bitcoin Scams," which recognized that "[s]cammers are looking to say and do anything to convince you of an urgent need to pay through Bitcoin, and they will often 'helpfully' point out nearby ATMs where you can follow their commands."

63.     On the same page, Athena stated that it "receives numerous reports of fraud per month, so we want to share much of what we've learned to look out for when it comes to Bitcoin, digital currency, and physical cash kiosks."



64. A former iteration of that webpage discussed "Impersonation scams" and explained that "Athena is the gateway for tens of thousands of customers to the world of Bitcoin" and therefore "some customers end up unwittingly victims of fraud perpetuated by con artists" who "like Bitcoin because transactions cannot be cancelled, reversed, or otherwise refunded once broadcast."

65. Athena has also received several complaints directly from consumers that they or a loved one had been victimized by scams utilizing Athena BTMs.

66. News outlets have also extensively covered the rise of fraud using BTMs to prey on vulnerable victims.

67. Yet Athena has not taken steps that would curb these abuses.

68. Moreover, Athena is aware that the measures that it has implemented are ineffective at curbing the escalating fraud occurring at its BTMs.

69. In an SEC filing, Athena points only to scant security measures like requiring customers to insert a phone number, a driver's license, or their Social Security Number.

70. These measures have done little to nothing to stop the most common form of BTM fraud, as fraudsters can simply direct their victims to input the requisite information.

71. Upon information and belief, Athena does not use common-sense measures that have been suggested by experts in the field.

72. For example, Athena does not use transaction limits.

73. Athena also does not hold transactions for a reasonable period when a first-time customer, like Plaintiff, makes a large transfer.

74. And Athena does not use analytics to screen fraudulent transactions.

75. These types of measures would likely limit fraud, but they are not used because they would cut into Athena's bottom line.

76. Finally, Athena does nothing to protect consumers from fraud during transactions, such as inquiring about the basis for transactions or reporting suspicious activity to appropriate authorities. Similar transactions would undoubtedly be scrutinized by personnel of a financial institution.

77. Not long after Plaintiff's experience, on September 11, 2024, members of the United States Senate Banking Committee sent a letter to Athena requesting that it "take immediate action to address troubling reports that [Athena's] Bitcoin ATMs (BTMs) are contributing to widespread financial fraud against elderly Americans" and asking for information regarding "what actions Athena Bitcoin is taking to address this problem" by October 4, 2024.

78. The letter further asked whether "Athena Bitcoin limit[s] the amount an individual can deposit or transfer in a single day, week, or other period of time," whether "Athena Bitcoin hold[s] deposited and transferred funds for any period of time or take[s] any other measures to allow transactions to be reversed in the case of fraud or mistake" and whether "Athena Bitcoin insure depositors against fraud."

79. Upon information and belief, the Senate Banking Committee's concerns went unaddressed.

### *Athena Profits from BTM Fraud Schemes*

80. Despite having knowledge of the rampant fraud carried out using its BTMs, Athena charges consumers exorbitant fees without ever disclosing the same.

81. Athena's markup is hidden within a fee-inclusive price that Athena misleadingly displays as the "exchange rate."

11

82. None of Athena's online marketing efforts disclose the fact that Athena charges transaction fees, much less their magnitude.

83. Athena's online advertisements direct consumers to the nearest BTM for "freedom," "security," and "satisfaction."

84. Athena's fees are not otherwise clearly disclosed by its BTMs.

85. Athena's only conceivable disclosure is a confusing and misleading reference to a "Transaction Service Margin" in its lengthy digital Terms of Service.

86. That disclosure is embedded within a more-than-seven-hundred-word wall-of-text in the scrollable Terms of Service on the BTM's digital interface.

87. Upon information and belief, it states:

A margin (the difference between the market price and the actual selling or buying price at the kiosk) will be assessed on your purchase or sale of cryptocurrencies in an amount disclosed to you at the time you make the offer to purchase or sell cryptocurrency.

88. The Terms of Service do not otherwise disclose the magnitude of the margin or that it is functionally a transaction fee.

89. The Terms of Service falsely claim that the extent of the Transaction Service Margin will be disclosed at the time of purchase.

90. But, again, Athena never discloses the margin or fee.

91. In order to determine the margin, an Athena customer would need to independently compare the spot price of Bitcoin to the "exchange rate" charged at the BTM.

92. The Terms of Service also present a misleading example that grossly undersells the fees that Athena actually charges:

For example, in the context of a purchase transaction, if you tender a $100 bill and the Transaction Service Margin is $4, the Transaction Service Margin will be assessed and deducted from the $100 and the remaining $96 will be used to calculate the quantity of any cryptocurrencies purchased by you at the quoted price.

93.    But the Transaction Service Margin is not a flat fee taken prior to the purchase as intimated by the Terms of Service.

94.    Rather, it is a fee hidden within the quoted price.

95.    In fact, the calculation driving Athena's substantial markups has been described as "proprietary" by Athena in an SEC filing, as follows:

> We charge a fee per crypto asset available through our Athena Bitcoin ATM, equal to the prevailing price at U.S.-based exchanges plus a markup that typically ranges between 13% and 26%. The prices shown to customers on our Bitcoin ATM are inclusive of this price spread . . . The markup varies by location. It is determined by a proprietary method that is maintained as a trade secret.

96.    But upon information and belief, the higher the transaction amount, the greater the fee that Athena takes.

97.    Even after transactions are completed, consumers still are not apprised of fees paid.

98.     Receipts show only the cash tendered and the Bitcoin received; they do not itemize transaction fees or even reflect that a fee was taken.

99.    The only way for customers to determine the amount of the fee paid is to manually research and compare the market price of Bitcoin (which can be volatile) at the time of the transaction with the fee-inclusive "exchange rate" actually charged by Athena.

### Plaintiff's Athena Experience

100.    Plaintiff Diane Reynolds is a seventy-seven-year-old woman who lives alone in Leisure World, a senior community located in Silver Spring, Maryland.

101.    Plaintiff was the full-time caregiver for her mother until her mother passed away on December 1, 2024.

102.    Plaintiff was the victim of an Athena BTM scam.

103.    On or about July 29, 2024, Plaintiff saw an alert on her laptop warning her of a security breach.

104. After trying to regain control of the computer for approximately an hour, she called the number displayed on the screen, believing it to be associated with Apple.

105. The person who answered the phone told Plaintiff that several hackers involved with pornography were accessing her computer.

106. The fraudster asked Plaintiff where she banked, and when she said Wells Fargo, the person on the phone purported to transfer the call to Wells Fargo.

107. The fake Wells Fargo representative called himself Michael Davis and claimed to be in touch with the Department of Justice.

108. He told Plaintiff that the hackers planned to remove substantial money from her account and that she needed to withdraw it before the hackers could do so.

109. He instructed Plaintiff to take the cash to an Athena BTM "to be sure it would be encrypted."

110. Plaintiff drove to Wells Fargo and, at the fraudster's urging, persuaded the teller to effectuate the withdrawal of $13,000 in cash.

111. The fraudster then gave Plaintiff the address of an Athena BTM, located inside a Shell Gas Station at 4101 Randolph Road, Silver Spring, MD 20906.

112. Plaintiff located the machine, and the fraudster sent Plaintiff a QR code that she held up to the camera of the Athena BTM.

113. Plaintiff did not realize that the QR code was connected to the fraudster's Bitcoin wallet.

114. Using the BTM's interface, Plaintiff accepted Athena's Terms of Service.

115. Plaintiff did not then believe that she was being defrauded.

14

116.    Plaintiff also did not know then that Athena was retaining a substantial amount of her deposit because Athena did not disclose that fee to her.

117.    In the absence of that information, Plaintiff maintained her belief that, by purchasing Bitcoin, she was simply securing her own money by converting it to Bitcoin, which would put it out of the hackers' reach.

118.    But in reality, Plaintiff paid $13,100 for approximately $8.500 worth of Bitcoin.[5]

119.    Had Plaintiff known that Athena was retaining such a large portion of her money, she would not have followed through with the transaction.

120.    It is substantially likely that most unsophisticated consumers also would not use Athena's BTMs had Athena disclosed its significant fee.

121.    But in the absence of meaningful disclosure about the fee, Plaintiff inserted bills totaling $13,100 into the machine, again believing that she was moving her money for safekeeping.

122.    At the end of the transaction, the Athena BTM printed a receipt:



---

[5] Yahoo! Finance, *Bitcoin USD Price (BTC-USD)*, https://tinyurl.com/53npkjxb (July 29–20, 2024) (showing price of Bitcoin at the time of the transaction).

123.    The next day, on or around July 30, 2024, Plaintiff received a fraud alert from Wells Fargo, which prompted her to go to the Montgomery County Police Department and file a report.

124.    Plaintiff reported the fraud to Athena but her request for reimbursement was rejected on the basis that Plaintiff authorized the transaction.

125.    Athena did not even refund Plaintiff the approximately $4,500 that it retained on Plaintiff's $13,100 transaction, and thus profited from the fraud.

### COUNT ONE:
### VIOLATION OF MCPA, Md. Code, Com. Law §§ 13-301(3) and (9)
### (Class Claim)

126.    Plaintiff incorporates each of the preceding allegations.

127.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of the following class:

> All Maryland residents who (1) purchased Bitcoin from an Athena Bitcoin ATM (2) and were charged a Transaction Service Margin (3) during the three-year period prior to the filing of this case.

Plaintiff is a putative class member.

128.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The class members' names and addresses can be identified through Athena's internal business records, and the class members may be notified of the pendency of this action by published or mailed notice

129.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Athena is a merchant; and (2) whether Athena violated §§ 13-301(3) and (9)

16

of the Commercial Law title of the Maryland Code by failing to disclose the fee it retained on consumer transactions using its BTMs.

130.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

131.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate class representative because her interests coincide with, and are not antagonistic to, the putative class members' interests. Plaintiff has retained experienced and competent counsel; she intends to continue to prosecute the action vigorously; she and her counsel will fairly and adequately protect the interests of the members of the class; and she and her counsel have no interest that might cause them to not vigorously pursue this action.

132.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Athena's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court

by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

133.    Athena violated §§ 13-301(3) and (9) by omitting information about its so-called "Transaction Service Margin" that would have otherwise dissuaded consumers from following through with Bitcoin transactions using Athena BTMs.

134.    Upon information and belief, Plaintiff alleges that, as a standard practice, Athena omitted information about the fees that customers were paying on BTM transactions.

135.    Upon information and belief, Athena's conduct is a part of a broader practice of frequent and persistent noncompliance with §§ 13-301(3) and (9).

136.    Plaintiff and the class members suffered injuries and losses as a result of Athena's violations of §§  13-301(3) and (9).

137.    Based on Athena's noncompliance with § 13-301(3) and (9), Plaintiff seeks, individually and on behalf of the class, damages and reasonable attorneys' fees under Md. Code, Com. Law § 13-408.

**COUNT TWO:**
**CONCEALMENT/NON-DISCLOSURE**
**(Class Claim)**

138.    Plaintiff incorporates each of the preceding allegations.

139.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of the following class:

> All residents of the United States who (1) purchased Bitcoin from an Athena Bitcoin ATM (2) and were charged a Transaction Service Margin (3) during the three-year period prior to the filing of this case.

Plaintiff is a putative class member.

140.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The class

members' names and addresses can be identified through Athena's internal business records, and the class members may be notified of the pendency of this action by published or mailed notice

141. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Athena had a duty to disclose information about its so-called "Transaction Service Margin"; (2) whether Athena failed to disclose that information; (3) whether Athena had an intent to deceive; and (4) whether Plaintiff and the class members suffered damages as a result of the concealment.

142. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

143. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate class representative because her interests coincide with, and are not antagonistic to, the putative class members' interests. Plaintiff has retained experienced and competent counsel; she intends to continue to prosecute the action vigorously; she and her counsel will fairly and adequately protect the interests of the members of the class; and she and her counsel have no interest that might cause them to not vigorously pursue this action.

144. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Athena's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

145.    Athena is liable for concealment because it intentionally omitted information about its so-called "Transaction Service Margin" that would have otherwise dissuaded consumers from following through with Bitcoin transactions using Athena BTMs.

146.    Athena's intentional decision to omit reference to the excessive fees that it charges was driven by its desire to continue to profit from the fraud made possible through the use of Athena BTMs.

147.    Plaintiff and the class members suffered damages as a result of Athena's concealment and non-disclosure.

148.    Plaintiff and the class members are likewise entitled to punitive damages because Athena acted with actual malice when it deceived customers to ensure continued profits, even with knowledge that its BTMs were being used to perpetrate fraud.

**COUNT THREE**
**VIOLATION OF THE MARYLAND SAFE ACT, Md. Code, Est. & Trusts § 13-601 *et seq.***
**(Class Claim)**

149.    Plaintiff incorporates each of the preceding allegations.

150.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of the following class:

> All residents of the State of Maryland who (1) while over the age of 68; (2) purchased Bitcoin from an Athena Bitcoin ATM (3) and were charged a Transaction Service Margin (4) during the five-year period prior to the filing of this case.

Plaintiff is a putative class member.

151.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The class members' names and addresses can be identified through Athena's internal business records, and the class members may be notified of the pendency of this action by published or mailed notice

152.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Athena stood in a position of trust and confidence with Plaintiff and the class members; (2) whether Athena knowingly obtained or used, or endeavored to obtain or use, Plaintiff's and the class members' funds, assets, or property with the intent to deprive Plaintiff and the class members of the use, benefit, or possession of the funds, assets, or property for the benefit of someone else in such a manner that is not fair and reasonable; (3) whether Athena obtained funds from Plaintiff and the class members by deception with the intent to deprive Plaintiff and the class members of the use, benefit, or possession of the funds, assets, or property for the benefit of someone else in such a manner that is not fair and reasonable; and (4) whether Plaintiff and the class members suffered damages as a result of Athena's conduct.

153. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

154. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate class representative because her interests coincide with, and are not antagonistic to, the putative class members' interests. Plaintiff has retained experienced and competent counsel; she intends to continue to prosecute the action vigorously; she and her counsel will fairly and adequately protect the interests of the members of the class; and she and her counsel have no interest that might cause them to not vigorously pursue this action.

155. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Athena's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

156.    The SAFE Act is remedial legislation that must be "construed and applied liberally to promote its purpose of deterring and remedying the financial exploitation of susceptible adults and older adults." Md. Code, Est. & Trusts § 13-608.

157.    As a "person" under the SAFE Act, Athena is prohibited from committing financial exploitation against susceptible adults and older adults.

158.    Financial exploitation means an act taken by a person who "[s]tands in a position of trust and confidence with a susceptible adult or older adult and who knowingly obtains or uses, or endeavors to obtain or use, a susceptible adult's or older adult's funds, assets, or property with the intent to temporarily or permanently deprive the susceptible adult or older adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the susceptible adult or older adult, in such a manner that is not fair and reasonable." Md. Code, Est. & Trusts § 13-601(e)(i).

159.    "Position of trust and confidence" means "a relationship, whether formed by a formal or informal agreement between a susceptible adult or older adult and another person or recognized by a formal declaration or court order, in which: (1) A person is entrusted with the use or management of the property or assets of the susceptible adult or older adult, or the susceptible adult's or older adult's care; **or** (2) There is a special confidence or trust placed in a person who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the susceptible adult or older adult." Md. Code, Est. & Trusts § 13-601(j) (emphasis added).

160.    Athena stood in a position of trust and confidence with Plaintiff and the class members because: (i) relationships were formed by a formal agreement by virtue of Athena's Terms of Service; and, in any event (ii) Athena was entrusted with Plaintiff's and the class

members' funds, which were expected to be exchanged and converted from cash to Bitcoin following deposit.

161. With respect to the fees that Athena charged and retained, Athena knowingly obtained money from Plaintiff and the class members with the intent to permanently deprive them of the same.

162. Athena's practice is neither fair nor reasonable because: (i) it profits from undisclosed fees at the expense of vulnerable residents of Maryland; and (ii) does so notwithstanding that it is on notice that its BTMs are used primarily for fraudulent schemes and mostly against elders.

163. Financial exploitation also means an act taken by a person who "[b]y deception, false pretenses, false promises, larceny, embezzlement, misapplication, conversion, intimidation, coercion, isolation, excessive persuasion, or similar actions and tactics, obtains or uses, or endeavors to obtain or use, a susceptible adult's or older adult's funds, assets, or property with the intent to temporarily or permanently deprive the susceptible adult or older adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the susceptible adult or older adult." Md. Code, Est. & Trusts § 13-601(e)(ii).

164. With respect to the fees that Athena charged and retained, Athena knowingly deceived Plaintiff and the class members with the intent to permanently deprive them of the fees that Plaintiff and the class members paid.

165. Athena's violative conduct has caused damages to Plaintiff and the class members.

166. Plaintiff and the class members are entitled to recover and seek compensatory damages, restitution, reasonable attorney's fees, and treble damages. Md. Code, Est. & Trusts § 13-606(c).

WHEREFORE, Plaintiff seeks actual, compensatory, treble, and punitive damages, as well as her attorneys' fees and costs as pleaded above against Athena; for pre-judgment and post-judgment interest at the legal rate, and any other relief the Court finds appropriate.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**PLAINTIFF**

By:     */s/ Kristi C. Kelly*
Kristi C. Kelly (Fed. Bar No. 07244)
J. Patrick McNichol (Fed. Bar No. 19034)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
E-mail: kkelly@kellyguzzo.com
E-mail : pat@kellyguzzo.com

*Counsel for Plaintiff*