**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **Diane Reynolds,** *on behalf of herself and all others similarly situated,* | * | ~~IN THE~~ |
| ~~15111 Glade Drive~~ | | |
| ~~Apt. 2G~~ | * | ~~CIRCUIT COURT FOR~~ |
| ~~Silver Spring, MD 20906~~ | * | ~~MONTGOMERY COUNTY~~ |
| | * | |
| Plaintiff, | * | ~~CASE NO:~~ |
| ~~v.~~ | * | |
| v. | * | Case No.:  8:25-cv-01318-PX |
| **Athena Bitcoin, Inc.** **TRIAL BY JURY IS DEMANDED** | * | .. |
| ~~1332 North Halsted Street~~ | | |
| ~~Suite 401~~ | * | |
| ~~Chicago, IL 60642~~ | | |
| | * | |
| ~~Serve on:~~ | | |
| ~~Incorp. Services, Inc.~~ | * | |
| ~~1519 York Road~~ | | |
| ~~Lutherville, MD 21093~~ | * | |
| ~~and~~ | * | |
| ~~Genesis Coin, Inc.~~ | * | |
| ~~c/o Andrew Barnard, CEO~~ | | |
| ~~1541 Sunset Drive~~ | * | |
| ~~Suite 202~~ | | |
| ~~Coral Gables, FL 33143~~ | * | |
| ~~Defendants.~~ | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

Defendant.                         *

\* \* \* \* \* \* \* \* \* \* \* \* \*

**AMENDED CLASS ACTION COMPLAINT**

**AND DEMAND FOR JURY TRIAL**

1.     Plaintiff Diane Reynolds ~~("Named Plaintiff" or "Plaintiff"),~~, on behalf of herself and all ~~others~~other similarly situated ~~(the "Class"), files this~~ individuals, alleges as follows for her Amended Class Action Complaint ~~and Demand for Jury Trial by and through undersigned counsel~~ against ~~Defendants~~ Athena Bitcoin, Inc. ("Athena~~") and Genesis Coin, Inc. ("Genesis") (together, "Defendants") and for cause states:~~").

## ~~BACKGROUND~~

~~1.     Elder financial scams are both rampant and increasing in the United States and in Maryland.~~

~~2.     The Federal Trade Commission ("FTC" or the "Commission") reported that in 2023 alone, elder financial scams accounted for a reported loss of $1.9 billion, an increase from the reported $1.6 billion lost in 2022. Because most fraud isn't reported, the actual figure could be as high as $61.5 billion. The FTC also found that older adults have higher median losses than younger adults.~~

~~3.     Many elder financial scams involve cryptocurrency transactions, which are untraceable, do not have legal protections, and are not reversible.~~

~~The Commission reported that older adults are especially vulnerable to scams involving payments made using cryptocurrency, such as~~ **PRELIMINARY STATEMENT**

~~4.~~ Athena operates ~~Bitcoin.~~

~~5.     While the largest share of cryptocurrency losses reported by older adults stem from investment scams, nearly half of reports involved business impersonation, tech support scams, and government impersonation scams. The number of reports about cryptocurrency payments by older adults on business impersonation, government impersonation, and tech support scams increased by over 80%, from 2,304 in 2022 to 4,191 in 2023.~~

6.     The FTC noted that victims of those scams "often report being directed to [Bitcoin Automatic Teller Machine ("ATMs")] to deposit cash."[1]

7.2.     Machines ("Bitcoin ATMs" or "BTMs"), which are free-standing kiosks akin to traditional Automated Teller Machines. ATMs.

3.     BTMs allow consumers to exchange fiat currency, like United States Dollars, for Bitcoin ATMs permit customers to buy, which is digital "money."

4.     Bitcoin is stored in a digital "wallet" that serves the same function as a bank account but without the oversight or security provided by a financial institution.

5.     Although Bitcoin has value, Athena does not sell Bitcoin at or even close to the prices at which Bitcoin can be purchased on common exchanges like Coinbase.

6.     Athena instead sells Bitcoin at prices that far exceed the asset's value at any given time. Plaintiff, for example, paid Athena $13,100 for 0.14538544 Bitcoin on July 29, 2024.

7.     Although Plaintiff paid more than $90,000 per one Bitcoin (prorated to her purchase amount), the value of one Bitcoin on July 29, 2024 was only $66,819.91.[2]



| Jul 29, 2024 - Jul 30, 2024 ⌄ | Historical Prices ⌄ | | Daily ⌄ | | | |
|---|---|---|---|---|---|---|
| | | | | | Currency in USD | 🔒 Download |
| Date | Open | High | Low | Close ⓘ | Adj Close ⓘ | Volume |
| Jul 30, 2024 | 66,819.05 | 66,987.67 | 65,323.19 | 66,201.02 | 66,201.02 | 31,380,492,109 |
| Jul 29, 2024 | 68,259.05 | 69,987.54 | 66,532.59 | 66,819.91 | 66,819.91 | 40,780,682,628 |

[1] FTC Consumer Protection Data Spotlight, *Bitcoin ATMs: A payment portal for scammers* (Sept. 3, 2024), *available at* https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/09/bitcoin-atms-payment-portal-scammers.

[2] Yahoo! Finance, *Bitcoin USD Price (BTC-USD)*, https://tinyurl.com/53npkjxb (July 29–20, 2024).

8.    In other words, Athena added about a 35% markup, functionally a service fee, to Plaintiff's purchase that Athena calls its "Transaction Service Margin."

9.    Even with an exchange fee structure that is so unfriendly to its users,[3] Athena has carved out a place in the cryptocurrency ~~assets (~~marketplace because consumers are often convinced to use BTMs at the direction of fraudsters.

10.    Fraudsters are not dissuaded by exorbitant fees that are paid by their victims, as evidenced by the volume of fraud involving Athena BTMs.

11.    In a lawsuit filed by the District of Columbia during the pendency of this action, it was alleged that "[m]ost deposits to Athena BTMs in the District [of Columbia] . . . are the product of outright fraud."[4]

12.    The District of Columbia further asserted that "Athena's machines are primarily used to facilitate fraudulent schemes that exploit the elderly and result in huge sums of money being transferred directly to scammers."[5]

13.    These claims are not novel.

~~8.~~14.    In fact, Athena has been on notice of its use as an instrumentality of fraud for several years, openly acknowledging since at least 2018 that its BTMs have posed a high risk of

---

[3] District of Columbia Office of the Attorney General, *Attorney General Schwalb Sues Crypto ATM Operator for Financially Exploiting District Residents* (Sept. 8, 2025), https://oag.dc.gov/sites/default/files/2025-09/Athena%20Complaint.pdf ("Athena BTMs charge District consumers fees of up to 26% per transaction without clearly disclosing them at any point in the process. Bitcoin purchased through other apps and exchanges typically have fees of 0.24% to 3%.").

[4] D.C. Complaint ¶ 1, https://oag.dc.gov/sites/default/files/2025-09/Athena%20Complaint.pdf.
[5] *Id.* ¶ 2.

being used as instrumentalities for impersonation scams, including Bitcoin) in exchange for cash issued by sovereign governments liked the United Statesagainst elders.

9.    The Commission found a nearly tenfold increase since 2020 in the amount lost to scammers using Bitcoin ATMs—from $12 million to $114 million. In the first half of 2024 alone, victims lost a staggering $65 million in Bitcoin ATM-related scams.

10.    Bitcoin-ATM related fraud is so prevalent that even those bullish on cryptocurrency and its decentralized nature have found Bitcoin ATMs to be problematic.[6]

11.    In these types of scams, the scammer places the victim under duress by threatening dangers that require urgent action to protect the victim's physical or financial well-being. Then, the scammer convinces the victim that the only way to avert the threatened danger is to deposit cash into a cryptocurrency-vending ATM, which converts U.S. Dollars into an untraceable cryptocurrency and transfers the Bitcoin to a "secure" Bitcoin wallet. The scammer then sends the user a QR code and instructs the user to hold the QR code up to the ATM camera. The QR code is embedded with the scammer's Bitcoin wallet address, causing the deposit of the Bitcoin directly into the scammer's online Bitcoin wallet.

15.    Defendants Notwithstanding that notice, Athena's BTMs continue to exist as instrumentalities of fraud because fraudulent schemes are of great value to Athena.

---

[6] Kevin Williams, *The bitcoin ATM has emerged as one of cryptocurrency's biggest threats*, CNBC (Sept. 8, 2024), https://www.cnbc.com/2024/09/08/biggest-risks-of-accessing-crypto-through-bitcoin-atm.html ("Bitcoin is decentralized, permission-less, and immutable. 'A transaction cannot be reversed or recalled if funds are deposited to the wrong address,' . . . . And while many crypto bulls find bitcoin's lack of governance appealing, that can be problematic in ATMs.'").

16.     In Plaintiff's case, Athena retained approximately 35% (about $4,500) of Plaintiff's $13,100 purchase price. The fraudster, meanwhile, absconded with the .014538544 in Bitcoin that Athena provided in exchange for the purchase price.

17.     Plaintiff had no idea that Athena was profiting from her purchase of Bitcoin, much less to such an extreme degree.

18.     Plaintiff's understanding was caused by Athena's representations and omissions.

19.     First, Athena's fee was not clearly disclosed by the BTM.

20.     Athena's only conceivable disclosure was a confusing and misleading reference to a "Transaction Service Margin" in its lengthy digital Terms of Service.

21.     That disclosure was embedded within a more-than-seven-hundred-word wall-of-text in the scrollable Terms of Service presented on BTM's digital interface.

22.     And, upon information and belief, it merely stated:

A margin (the difference between the market price and the actual selling or buying price at the kiosk) will be assessed on your purchase or sale of cryptocurrencies in an amount disclosed to you at the time you make the offer to purchase or sell cryptocurrency.

23.     That mere reference to a confusing and ambiguous term failed to disclose to Plaintiff the magnitude of the margin or that it was functionally a transaction fee.

24.     Second, the Terms of Service falsely claimed that the extent of the Transaction Service Margin would be disclosed at the time of purchase.

25.     Athena never disclosed the margin or fee to Plaintiff.

26.     In order to determine the margin, Plaintiff would have ~~long~~needed to independently compare the spot price of Bitcoin to the "exchange rate" charged at the BTM.

27.     And third, the Terms of Service otherwise presented a misleading example:

For example, in the context of a purchase transaction, if you tender a $100 bill and the Transaction Service Margin is $4, the Transaction Service Margin will be

assessed and deducted from the $100 and the remaining $96 will be used to calculate the quantity of any cryptocurrencies purchased by you at the quoted price.

28. Of course, in Plaintiff's situation, the Transaction Service Margin was not a flat fee taken prior to the purchase as intimated by the Terms of Service.

29. Rather, it was a fee hidden within the quoted price.

30. Not only that, but Athena's example grossly undersold the magnitude of the fee that Athena actually charged Plaintiff.

31. Plaintiff was not otherwise told that she would receive significantly less in Bitcoin than the value of the cash she had exchanged.

32. As a result, Plaintiff had no reason to know that Athena was keeping more than one third of her money.

33. As a consequence, Plaintiff maintained her belief that, by purchasing Bitcoin, she was *securing her money* and protecting it from hackers.

34. Had Plaintiff known that Athena ~~ATMs are exploited by criminals to facilitate illegal activity such as fraud, money laundering, and scams~~was retaining so much of her hard-earned money, she would not have followed through with the transaction.

35. Athena's failure to disclose was material. Indeed, it is substantially likely that most unsophisticated consumers would not use Athena's BTMs if they knew about the massive fee baked into the represented price of Bitcoin.

~~12.~~36. Making matters worse, even after Athena became aware that Plaintiff was the victim of a scam, Athena refused to reimburse her, including ~~cryptocurrency ATM scams.~~the significant portion of the purchase price that it retained.

37. Upon information and belief, when Athena becomes aware that one of its BTMs was used to perpetrate fraud—and that Athena, in turn, profited greatly at the expense of a

7

customer—Athena rejects reimbursement on the basis that the customer was defrauded not by it, but by a third party.

38. Upon information and belief, Athena invariably retains some, if not all, of its profits.

13. By overcharging Plaintiff for Bitcoin in the absence of meaningful disclosure of that fee, Athena engaged in an "unfair, abusive, or deceptive trade practice . . . in . . . [t]he sale of . . . consumer goods . . . or consumer services," in violation of the Maryland Consumer Protection Act ("MCPA"). Md. Code, In fact, on September 12, 2024, United States Senator Dick Durbin of Illinois led a group of seven Senators in pressing the ten largest Bitcoin ATM operators, including Athena, to curb such fraud against elderly Americans.

14. Despite their knowledge, Defendants have—for years—failed to prevent, intercept, and/or mitigate the elder financial scams involving Athena ATMs.

15. Defendants' failures breached the duties they assumed to prevent, intercept, and mitigate elder financial abuse through Athena ATMs. To be sure, Defendants recognized the prevalence and severity of elder financial scams involving Athena ATMs and held themselves out to the public and their customers that it "ensures safe and secure banking . . . ."

16. Defendants also neglected to intervene in (*i.e.*, stop) such scams from happening. As such, Athena ATMs continued to be used in cryptocurrency scams, money laundering, and other illegal transactions.

17. Defendants, of course, have always been capable of implementing effective and sufficient checks and procedures both at the ATMs and internally that would have prevented, mitigated, or deterred the use of the ATMs in scams such as the one in this case. Defendants, however, knowingly chose to not adopt effective checks or balances because doing so would

8

thwart a substantial volume of their business and the profits gained from every dollar inserted into the ATM.

18. Upon information and belief, the primary use of Athena ATMs is transactions related to fraud perpetrated against elders.[7]

19. In fact, traditional cryptocurrency trading platforms advise investors against using Bitcoin ATMs because they have higher transaction fees compared to other transaction methods.[8] Put differently, a typical cryptocurrency investor has little incentive to use a Bitcoin ATM.

20. In their SEC filings, Athena acknowledges that their "total revenue is substantially dependent on the volume of transactions conducted by our customers. If such volume declines, our business, operating results, and financial position would be adversely affected."

21. Defendants' incentive to turn a blind eye to fraud is devastating to older adult victims.

22. Plaintiff, for example, lost thousands of dollars due to Defendants' negligent, reckless, and knowing failure and refusal to implement appropriate and sufficient measures and procedures to prevent, intervene, mitigate, and/or deter the use of ATMs in fraudulent activity.

23. Rather than pursue fixes that would effectively thwart escalating and rampant ATM-involved schemes, Defendants remain laser-focused on profits and their bottom lines.

---

[7] See, e.g., Rob Wile & Christina Romans, *Bitcoin ATM scams are soaring — and older adults are increasingly the victims*, CNBC (Sept. 1, 2024), https://www.cnbc.com/2024/09/01/bitcoin-atm-scams-surge-disproportionately-duping-older-adults.html ("[R]oughly $2 out of every $3 lost in a scam involving a bitcoin ATM belonged to someone near or over retirement age."); Williams, *supra* ("Although the bitcoin ATM isn't exactly drawing crowds, Patel says a surprising number of senior citizens show up at the kiosk, alarming given the rise of bitcoin ATM scams targeting seniors.").

[8] See, e.g., Coinbase, *Bitcoin ATMs: how to use them and how do they work?*, https://www.coinbase.com/learn/tips-and-tutorials/bitcoin-atms-how-to-use-them-and-how-do-they-work (last visited Jan. 14, 2025).

24. Athena charges transaction fees between 20 and 25%. They are able to charge such high fees because scammers either don't mind or are willing to pay higher fees due to the anonymity the service provides. And the victims don't realize what's happening.

39. Plaintiff and Com. Law § 13-303(1).

40. Athena omitted information about its "Transaction Service Margin," an omission that tends to deceive and that was made so Plaintiff would "rely on [it] in connection with: . . . [t]he promotion or sale of any . . . consumer service." *Id.* §§ 13–301(3), (9).

41. Because Athena did so systematically, Plaintiff asserts an MCPA claim on behalf of a class of similarly situated Maryland consumers.

25.42. Plaintiff and the class members are entitled to restitution, damages, penalties, injunctive relief, and other relief for any injury or loss caused by Athena's violations, as well as appropriate. their reasonable attorneys' fees. *Id.* § 13-408(a)–(b).

**PARTIES**

26. Plaintiff Diane Reynolds is a resident of Montgomery County, Maryland. She is a resident of Silver Spring and has been at all times relevant to this action.

43. Plaintiff additionally asserts a class claim for concealment and seeks compensatory damages and punitive damages, the latter based on Athena's intentional decision to omit reference to the excessive fee that it charges—a fee that is only made practicable by Athena's willingness to ignore the fraudulent schemes from which it benefits.

44. Finally, Plaintiff alleges a class claim on behalf of Maryland class members aged 68 or older for violations of Mayland Stop Adult Financial Exploitation (SAFE) Act.

45. Athena financially exploited Maryland elders by failing to disclose its excessive transaction fees while in a position of trust and confidence per the parties' agreement and because Athena handled Plaintiff's and the class members' funds for the purpose of a purported exchange.

10

27. Defendant Athena Bitcoin, Inc. is a Delaware corporation headquartered in Illinois. Athena is not currently registered to do business in the State of Maryland; its license was forfeited in November 2024 for failure to file documents. Athena is a wholly-owned subsidiary of parent company Athena Bitcoin Global, a Nevada corporation founded in 1991 under the name "GamePlan, Inc."

28. Defendant Genesis Coin, Inc. is a Delaware corporation that is headquartered in Florida. Genesis has never been licensed to do business in the State of Maryland.

## JURISDICTION AND VENUE

46. This Court may properly exercise jurisdiction over Defendants pursuant toThis Court has jurisdiction under 28 U.S.C. § 1332(d) because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which Plaintiff and Athena are citizens of different states.

29. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because Plaintiff resides Md. Code, Cts. & Jud. Proc. § 6-103. Defendants transact or transacted business in Maryland. At all times relevant to this Complaint, Defendants purposefully placed, operated, maintained, and derived substantial revenue from approximately 138 separate Athena ATMs in Maryland, including the Athena Bitcoin ATM at issue in this case.

47. Venue in this District and Division, and a substantial part of the events giving rise to Plaintiff's claims occurred here.

## PARTIES

48. is proper pursuant to Md. Code, Cts. & Jud. Proc. §§ 6-201 and 6-202. Defendants carry on or carried on regular business withinPlaintiff Diane Reynolds is a resident of Montgomery County, Maryland. She is a "consumer" as defined by the MCPA, Md. Code, Com. Law § 13-101(c)(1).

30.49.  Defendant Athena Bitcoin, Inc. is a Delaware corporation headquartered and the cause of action arose in Illinois. Athena is a "merchant" as defined by the MCPA, Md. Code, Com. Montgomery County.Law § 13-101(g)(1).

**FACTUAL ALLEGATIONS**

**A.  Athena's Bitcoin ATMs Facilitated Fraud**

31.    Athena was founded on September 18, 2015.

Athena's parent company,FACTS

32.    *The Use of* Athena Bitcoin Global, was founded*BTMs in* 1991.*Fraud Schemes*

33.    As of December 2024, Athena operates more than 3,000 ATMs across the United States, El Salvador, Colombia, Argentina, and Mexico.

50.    Athena's ATMsBTMs allow customers to exchange their physical currency, like United States Dollars, for cryptocurrency or other digital assets.

34.    Customers can deposit cash into the machines and receive cash from the machines.

35.    Athena's ATMs are located in various strategic locations—especially service stations and convenience stores—and present themselves as traditional ATMs.

36.    In its most recent SEC filing, Athena stated that its "site selection criteria and metrics are a closely guarded proprietary aspect of our business. In placing our ATMs, we employ a data driven strategy based on a multitude of factors."

37.    Upon information and belief, Defendants intentionally placed ATMs in neighborhoods with large shares of low-income families and older adults.

38.    Upon information and belief, Defendants placed ATMs in those locations because Defendants desired a high volume of ATM transactions, even if caused by scams at the expense of elderly and/or desperate customers.

12

39. At all times relevant, Defendants paid stores a fixed monthly payment to host their ATMs.

40. Athena purchased its ATMs from Genesis.

41. Athena's ATMs are connected to the Internet and use either its own software or software from Genesis.

42. The software allows customers to log-in to their Bitcoin wallets, deposit cash, and convert cash to Bitcoin stored in their wallets.

43. The software allows Athena to monitor its ATM network and collect data. The software also allows Athena to disable an ATM if there is a security concern.

44. To use an Athena ATM, customers first select a range of Bitcoin to purchase. According to its SEC filings, the ATM "may ask you to provide a form of ID such as a state ID or a Driver's License."

Formatted: Font: Times New Roman, 14 pt, Italic

Formatted: Right






*Graphic used on Athena's 2024 SEC filing*

51.    ~~Customers then select what~~ the type of cryptocurrency that they wish to purchase ~~in exchange for United States currency. The machine can then scan,~~ and the BTM scans a QR code from the customer's (~~or, as is~~ often ~~the case, the~~ a fraud ~~victim's~~victim) phone.

Formatted: Ligatures: Standard + Contextual

52.    The customer then inserts cash into the machine, bill by bill.

Formatted: Ligatures: Standard + Contextual

Formatted: Font: (Default) Times New Roman, 12 pt

14

45.53. According to ~~its most~~a recent SEC filing, "Athena Bitcoin transactions are broadcast within 15 minutes from the time you finish at the ATM."





*Graphic used on Athena's 2024 SEC filing*

46.    Defendants are engaged in the business of placing and operating cryptocurrency ATMs through which they sell shares of Bitcoin.

47.     At all times relevant, Defendants knew that Athena ATMs were being exploited by criminals to facilitate illegal activity, such as fraud, money laundering, gambling, tax evasion, and scams.

48.     In its latest SEC filing, Athena stated that one risk factor for its business operations and financial position is "existing and potential users may lose confidence in cryptocurrency-related products and services" and that one reason for the public's lack of confidence is the number of related businesses being "sued, investigated, or shut down to do fraud, manipulative practices, business failure and security breaches." They acknowledged that "[i]n many of these instances, customers of these businesses were not compensated or made whole for their losses."



16




54.     BTMs are a preferred tool for fraudsters because they offer speed, anonymity, cross-border functionality, and irreversibility of cash-to-crypto transactions

55.     The median reported loss per scam involving a BTM is $10,000, compared to $447 for fraud more generally.

56.     Losses are greater because fraudsters are able to take advantage of the BTM industry's lack of mandatory transaction holds, minimal fraud screening, and weak internal consumer protections.

57.     Fraudsters do not select BTM providers randomly.

17

58. They direct victims to specific operators, favoring those with lenient security measures and weak fraud prevention protocols.

59. Athena has played a major role in the BTM fraud crisis, operating thousands of BTMs worldwide, including several in the State of Maryland.

60. The D.C. attorney general reported several months ago that Athena's kiosks in neighboring Washington D.C. averaged $4,592 per transaction.

61. Athena, of course, is aware of its involvement in fraud schemes.

62. On its website at or around the time this case was filed, Athena published a section titled "Avoid these Bitcoin Scams," which recognized that "[s]cammers are looking to say and do anything to convince you of an urgent need to pay through Bitcoin, and they will often 'helpfully' point out nearby ATMs where you can follow their commands."

63. On the same page, Athena stated that it "receives numerous reports of fraud per month, so we want to share much of what we've learned to look out for when it comes to Bitcoin, digital currency, and physical cash kiosks."

18

Further illustrating this point,



64.    A former iteration of that webpage discussed "Impersonation scams" and explained that "Athena is the gateway for tens of thousands of customers to the world of Bitcoin" and therefore "some customers end up unwittingly victims of fraud perpetuated by con artists" who "like Bitcoin because transactions cannot be cancelled, reversed, or otherwise refunded once broadcast."

51.65.  Athena has also received several complaints directly from consumers that they or a loved one had been victimized by scams utilizing Athena ATMsBTMs.

52.    The Consumer Financial Protection Bureau's records show complaints relating to Athena ATMs as early as January 2020.

53.66.  Since around that time, newsNews outlets have also extensively covered the rise of crypto scamsfraud using Bitcoin ATMsBTMs to prey on vulnerable victims.

67.    Yet Defendants haveAthena has not taken steps that would curb these abuses.

54.68.  Moreover, Defendants areAthena is aware that the measures they havethat it has implemented are ineffective at curbing the escalating fraud occurring at its ATMsBTMs.

19

69. In ~~its latest~~an SEC ~~filings, Defendants point to~~filing, Athena points only ~~a few~~to scant security measures~~, all of which are obviously inadequate. For example, Defendants sometimes require~~ like requiring customers~~/victims~~ to insert a phone number, a driver's license, or their Social Security Number.

~~55.~~70. These measures ~~do~~have done little to nothing to stop the most common form of ~~Bitcoin ATM~~BTM fraud, as ~~scammers~~fraudsters can ~~easily~~simply direct their victims to input the requisite information.

71. Upon information and belief, ~~Defendants do~~Athena does not use common-sense measures that have been suggested by experts in the field.

72. For example, ~~Defendants do~~Athena does not use transaction limits. ~~Defendants do~~

73. Athena also does not hold transactions for a reasonable period when a first-time customer, like Plaintiff, makes a large transfer ~~two states have passed legislation requiring as much. Defendants do~~.

74. And Athena does not use analytics to screen ~~for~~ fraudulent transactions. ~~And Defendants do not provide transaction receipts with transaction hashes that make it easier for law enforcement to trace and recover stolen funds.~~

~~56.~~75. These types of measures ~~are~~would likely ~~to be effective at stemming~~limit fraud, but they are not used because they would ~~also likely~~ cut into ~~Defendants'~~Athena's bottom line.

~~57.~~76. Finally, ~~Defendants do~~Athena does nothing to protect consumers from ~~scams~~fraud during transactions, such as inquiring about the basis for ~~their~~ transactions or reporting suspicious activity to appropriate authorities. Similar transactions would undoubtedly be scrutinized by personnel of a financial institution.

77.     Not long after Plaintiff's experience, on September 11, 2024, members of the United States Senate Banking Committee sent a letter to Athena requesting that it "take immediate action to address troubling reports that [Athena's] Bitcoin ATMs (BTMs) are contributing to widespread financial fraud against elderly Americans" and asking for information regarding "what actions Athena Bitcoin is taking to address this problem" by October 4, 2024.

78.     The letter further asked whether "Athena Bitcoin limit[s] the amount an individual can deposit or transfer in a single day, week, or other period of time," whether "Athena Bitcoin hold[s] deposited and transferred funds for any period of time or take[s] any other measures to allow transactions to be reversed in the case of fraud or mistake" and whether "Athena Bitcoin insure depositors against fraud."

79.     Upon information and belief, the Senate Banking Committee's concerns went unaddressed.

### *Athena Profits from BTM Fraud Schemes*

80.     Despite having knowledge of the rampant fraud carried out using its BTMs, Athena charges consumers exorbitant fees without ever disclosing the same.

81.     Athena's markup is hidden within a fee-inclusive price that Athena misleadingly displays as the "exchange rate."

82.     None of Athena's online marketing efforts disclose the fact that Athena charges transaction fees, much less their magnitude.

83.     Athena's online advertisements direct consumers to the nearest BTM for "freedom," "security," and "satisfaction."

84.     Athena's fees are not otherwise clearly disclosed by its BTMs.

21

Formatted: Font: Times New Roman, 14 pt, Italic

Formatted: Right

85.    Athena's only conceivable disclosure is a confusing and misleading reference to a "Transaction Service Margin" in its lengthy digital Terms of Service.

86.    That disclosure is embedded within a more-than-seven-hundred-word wall-of-text in the scrollable Terms of Service on the BTM's digital interface.

87.    Upon information and belief, it states:

A margin (the difference between the market price and the actual selling or buying price at the kiosk) will be assessed on your purchase or sale of cryptocurrencies in an amount disclosed to you at the time you make the offer to purchase or sell cryptocurrency.

88.    The Terms of Service do not otherwise disclose the magnitude of the margin or that it is functionally a transaction fee.

89.    The Terms of Service falsely claim that the extent of the Transaction Service Margin will be disclosed at the time of purchase.

90.    But, again, Athena never discloses the margin or fee.

91.    In order to determine the margin, an Athena customer would need to independently compare the spot price of Bitcoin to the "exchange rate" charged at the BTM.

92.    The Terms of Service also present a misleading example that grossly undersells the fees that Athena actually charges:

For example, in the context of a purchase transaction, if you tender a $100 bill and the Transaction Service Margin is $4, the Transaction Service Margin will be assessed and deducted from the $100 and the remaining $96 will be used to calculate the quantity of any cryptocurrencies purchased by you at the quoted price.

93.    But the Transaction Service Margin is not a flat fee taken prior to the purchase as intimated by the Terms of Service.

94.    Rather, it is a fee hidden within the quoted price.

95.    In fact, the calculation driving Athena's substantial markups has been described as "proprietary" by Athena in an SEC filing, as follows:

Formatted: Font: (Default) Times New Roman, 12 pt

58.    We charge a fee per crypto asset available through our Athena Bitcoin ATM, equal to the prevailing price at U.S.-based exchanges plus a markup that typically ranges between 13% and 26%. The prices shown to customers on our Bitcoin ATM are inclusive of this price spread . . . The ~~Defendants are capable of implementing effective procedures to prevent, deter, and mitigate these scams, but knowingly choose not to adopt them because doing so would reduce the immense profits they gain from every dollar inserted into an ATM.~~

~~B.    Plaintiff's Story~~

markup varies by location. It is determined by a proprietary method that is maintained as a trade secret.

96.    But upon information and belief, the higher the transaction amount, the greater the fee that Athena takes.

97.    Even after transactions are completed, consumers still are not apprised of fees paid.

98.    Receipts show only the cash tendered and the Bitcoin received; they do not itemize transaction fees or even reflect that a fee was taken.

99.    The only way for customers to determine the amount of the fee paid is to manually research and compare the market price of Bitcoin (which can be volatile) at the time of the transaction with the fee-inclusive "exchange rate" actually charged by Athena.

### *Plaintiff's Athena Experience*

~~59.~~100.    Plaintiff Diane Reynolds is a seventy-~~five~~seven-year-old woman who lives alone in Leisure World, a senior community located in Silver Spring, Maryland.

~~60.~~101.    Plaintiff was the full-time caregiver for her mother until her mother passed away on December 1, 2024.

~~61.~~102.    Plaintiff was the victim of ~~a Bitcoin ATM~~an Athena BTM scam.

23

103.   On or about July 29, 2024, Plaintiff saw an alert on her laptop warning her of a security breach.

104.   After trying to regain control of the computer for approximately an hour, she called the number displayed on the screen, believing it to be associated with Apple.

~~62.~~105.   The person who answered the phone told Plaintiff that several hackers involved with pornography were accessing her computer. ~~He asked Plaintiff where she banked, and when she said Wells Fargo, the person on the phone claimed to transfer the call to Wells Fargo Bank.~~

106.   The fraudster asked Plaintiff where she banked, and when she said Wells Fargo, the person on the phone purported to transfer the call to Wells Fargo.

107.   The fake Wells Fargo representative called himself Michael Davis. ~~The scammer~~ and claimed to be in touch with the Department of Justice.

108.   He told Plaintiff that the hackers planned to remove ~~lots of~~substantial money from her account and that she needed to withdraw it before ~~they~~the hackers could do so.

~~63.~~109.   He instructed Plaintiff to take the cash to an Athena ~~ATM~~BTM "to be sure it would be encrypted."

~~64.~~110.Plaintiff drove to Wells Fargo and, at the ~~scammer's~~fraudster's urging, persuaded the teller to effectuate the withdrawal of $13,000 in cash.

~~65.~~111.The ~~scammer~~fraudster then gave Plaintiff the address of an Athena ~~ATM~~BTM, located inside a Shell Gas Station at 4101 Randolph Road, Silver Spring, MD 20906. ~~The location – which isn't far from other Athena ATMs – is in a working-class neighborhood with a heavy immigrant population. It is close to Leisure World and several other senior communities.~~

24

The area is not replete with crypto investors—or consumers who fit the but instead with potential fraud victims.

66.    Plaintiff located the machine, and the scammer stayed on the phone with her through the transaction.

112.    The scammerfraudster sent Plaintiff a QR code that she held up to the camera of the Athena ATM. SheBTM.

113.    Plaintiff did not realize that the QR code was connected to the scammer'sfraudster's Bitcoin wallet. She

114.    Using the BTM                                a's Terms of Service.

115.    Plaintiff did no                            auded.

116.    Plaintiff also d                            aining a substantial amount of her deposit because Athena di

117.    In the absenc                              intained her belief that, by purchasing Bitcoin, she was s                onverting it to Bitcoin, which would put it out of the hacker

118.    But in reality,                            ly $8,500 worth of Bitcoin.[9]

119.    Had Plaintiff k                            a large portion of her money, she would not have followed through with the transaction.

120.    It is substantially likely that most unsophisticated consumers also would not use Athena's BTMs had Athena disclosed its significant fee.

---

[9] Yahoo! Finance, *Bitcoin USD Price (BTC-USD)*, https://tinyurl.com/53npkjxb (July 29–20, 2024) (showing price of Bitcoin at the time of the transaction).

121.    But in the absence of meaningful disclosure about the fee, Plaintiff inserted ~~each bill one after another~~bills totaling $13,100 into the machine~~.~~, again believing that she was moving her money for safekeeping.

~~67.~~122.    At the end of the transaction, the Athena ~~ATM~~BTM printed a receipt~~.~~:



~~68.    After the transfer, the scammer repeatedly called and texted Plaintiff, attempting to convince her to withdraw more money. This alarmed Plaintiff.~~

~~69.~~123.    The next day, on or around July 30, 2024, Plaintiff received a fraud alert from Wells Fargo, which prompted her to go to the Montgomery County Police Department and file a report.

**~~CLASS ACTION ALLEGATIONS~~**

~~70.~~    Plaintiff ~~re-alleges and incorporates by reference herein all~~reported the ~~allegations contained above.~~

~~71.    Pursuant to Maryland Rule 2-231,~~ fraud to Athena but her request for reimbursement was rejected on the basis that Plaintiff ~~asserts claims on behalf of the following~~

26

~~Class: **All Marylanders 68 and older, currently living or deceased, who were victims of a financial scam involving an Athena ATM from January 7, 2020 to the present.**~~

~~72.~~124.        ~~Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; all judges assigned to hear any aspect of this litigation, as well as their immediate family members; and any individuals who have been granted a discharge pursuant to the United States Bankruptcy Code or state receivership laws after the date of the fraudulent~~ authorized the transaction ~~using one of Defendants' machines~~.

125.    ~~The Class, as defined above, is identifiable. Named~~Athena did not even refund Plaintiff the approximately $4,500 that it retained on Plaintiff's $13,100 transaction, and thus profited from the fraud.

**COUNT ONE:**
**VIOLATION OF MCPA, Md. Code, Com. Law §§ 13-301**~~(is a member~~**3) and (9)**
**(Class Claim)**

126.    Plaintiff incorporates each of the preceding allegations.

~~73.~~127. Under Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of the following class~~.~~:

> All Maryland residents who (1) purchased Bitcoin from an Athena Bitcoin ATM (2) and were charged a Transaction Service Margin (3) during the three-year period prior to the filing of this case.

Plaintiff is a putative class member.

~~74.~~128. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, ~~the Class consists, at a minimum, of several dozen Maryland seniors and is thus~~ Plaintiff alleges that the

class members are so numerous that joinder of all ~~members if clearly impracticable.~~is impractical. The class members' names and addresses can be identified through Athena's internal business records, and the class members may be notified of the pendency of this action by published or mailed notice

75.    ~~There are~~ **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact ~~which are not only common to the Class but which~~ exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over ~~any~~the questions affecting only individual class members.

76.    The ~~common and predominating questions for the Class~~principal issues include~~, but are not limited to~~:

a.    ~~Whether Defendants knew or should have known of the susceptibility of Plaintiff and Class Members in financial scams involving Athena ATMs;~~

b.    ~~Whether Defendants financially exploited Plaintiff and Class Members by facilitating fraud on Athena ATMs;~~

c.    ~~Whether Defendants' security procedures and practices to intervene, prevent, mitigate, and/or deter financial scams involving its Athena ATMs were reasonable;~~

~~d.~~129.  ~~Whether Defendants have knowledge that its Athena ATMs are used by criminals to engage in~~: (1) whether Athena is a merchant; and (2) whether Athena violated §§ 13-301(3) and (9) of the Commercial Law title of the Maryland Code by failing to disclose the fee it retained on consumer transactions ~~for illegal goods and services, including drug sales and trafficking, human trafficking, and prostitution;~~using its BTMs.

e.    ~~Whether Defendants failed to design and manufacture its Athena ATMs to deter the victimization of its users;~~

28

f.      ~~Whether Plaintiff and Class Members are entitled to actual and/or treble damages and/or whether injunctive, corrective, and/or declaratory relief is/are appropriate as~~ **Typicality. Fed. R. Civ. P. 23(a**~~a result of Defendants' wrongful conduct; and~~

g.      ~~Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct.~~

130.    )(3). Plaintiff's claims are typical of the claims of ~~the Class Members within the meaning of Maryland Rule 2-231~~each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

131.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate class representative because her interests coincide with, and are not antagonistic to, the putative class members' interests. Plaintiff has retained experienced and competent counsel; she intends to continue to prosecute the action vigorously; she and her counsel will fairly and adequately protect the interests of the members of the class; and she and her counsel have no interest that might cause them to not vigorously pursue this action.

77.     **Superiority. Fed. R. Civ. P. 23(b)(3**~~) and are based on and arise out of similar facts constituting the wrongful conduct of Defendants. The prosecution of separate actions by individual members of the Class would create a risk of establishing incompatible standards of conduct for Defendants, within the meaning of Maryland Rule 2-231(c)(1)(A).~~

~~78.~~132.        ~~Common questions~~**).** Questions of law and fact ~~enumerated above~~common to the class members predominate over questions affecting only individual members ~~of the Class~~, and a class action is ~~the~~ superior ~~method~~to other available methods for fair and efficient adjudication of the controversy~~, within the meaning of Rule 2-231(c)(3). The likelihood that~~. The damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual ~~members of the Class will prosecute separate actions is remote due to~~ litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the ~~time~~courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense ~~necessary to conduct such litigation~~to all parties and to the court system presented by the legal and factual issues raised by Athena's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

79.    ~~Plaintiffs' counsel is experienced in class actions and foresee little difficulty in the management of this case as a class action.~~

80.    ~~Named Plaintiff is adequate and has no interest antagonistic to the Class and will fairly represent the interests of the Class in accordance with their affirmative obligations and fiduciary duties.~~

**~~COUNT ONE~~**
**~~VIOLATION OF THE MARYLAND SAFE ACT~~**
**~~Md. Code, Est. & Trusts § 13-601, *et seq.*~~**
**~~On Behalf of the Class~~**
**~~(Against all Defendants)~~**

133.    Athena violated §§ 13-301(3) and (9) by omitting information about its so-called "Transaction Service Margin" that would have otherwise dissuaded consumers from following through with Bitcoin transactions using Athena BTMs.

134.    Upon information and belief, Plaintiff ~~re-~~alleges that, as a standard practice, Athena omitted information about the fees that customers were paying on BTM transactions.

135.    Upon information and belief, Athena's conduct is a part of a broader practice of frequent and persistent noncompliance with §§ 13-301(3) and (9).

30

136.    Plaintiff and the class members suffered injuries and losses as a result of Athena's violations of §§ 13-301(3) and (9).

137.    Based on Athena's noncompliance with § 13-301(3) and (9), Plaintiff seeks, individually and on behalf of the class, damages and reasonable attorneys' fees under Md. Code, Com. andLaw § 13-408.

## COUNT TWO:
## CONCEALMENT/NON-DISCLOSURE
### (Class Claim)

138.    Plaintiff incorporates by referenceeach of the preceding allegations set forth above, and further.

139.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of the following class:

> All residents of the United States who (1) purchased Bitcoin from an Athena Bitcoin ATM (2) and were charged a Transaction Service Margin (3) during the three-year period prior to the filing of this case.

Plaintiff is a putative class member.

81.140. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges: that the class members are so numerous that joinder of all is impractical. The class members' names and addresses can be identified through Athena's internal business records, and the class members may be notified of the pendency of this action by published or mailed notice

141.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Athena had a duty to disclose information about its so-called "Transaction Service Margin"; (2) whether Athena failed to disclose that information; (3) whether Athena had

31

an intent to deceive; and (4) whether Plaintiff and the class members suffered damages as a result of the concealment.

142.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

143.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate class representative because her interests coincide with, and are not antagonistic to, the putative class members' interests. Plaintiff has retained experienced and competent counsel; she intends to continue to prosecute the action vigorously; she and her counsel will fairly and adequately protect the interests of the members of the class; and she and her counsel have no interest that might cause them to not vigorously pursue this action.

144.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Athena's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court

by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

145.    Athena is liable for concealment because it intentionally omitted information about its so-called "Transaction Service Margin" that would have otherwise dissuaded consumers from following through with Bitcoin transactions using Athena BTMs.

146.    Athena's intentional decision to omit reference to the excessive fees that it charges was driven by its desire to continue to profit from the fraud made possible through the use of Athena BTMs.

147.    Plaintiff and the class members suffered damages as a result of Athena's concealment and non-disclosure.

148.    Plaintiff and the class members are likewise entitled to punitive damages because Athena acted with actual malice when it deceived customers to ensure continued profits, even with knowledge that its BTMs were being used to perpetrate fraud.

**COUNT THREE**
The Mayland Stop Adult Financial Exploitation (**VIOLATION OF THE MARYLAND SAFE**) Act **ACT, Md. Code, Est. & Trusts § 13-601,** *et seq.*, constitutes.
**(Class Claim)**

149.    Plaintiff incorporates each of the preceding allegations.

150.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of the following class:

> All residents of the State of Maryland who (1) while over the age of 68;
> (2) purchased Bitcoin from an Athena Bitcoin ATM (3) and were charged
> a Transaction Service Margin (4) during the five-year period prior to the
> filing of this case.

Plaintiff is a putative class member.

151.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The class

members' names and addresses can be identified through Athena's internal business records, and the class members may be notified of the pendency of this action by published or mailed notice

152.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Athena stood in a position of trust and confidence with Plaintiff and the class members; (2) whether Athena knowingly obtained or used, or endeavored to obtain or use, Plaintiff's and the class members' funds, assets, or property with the intent to deprive Plaintiff and the class members of the use, benefit, or possession of the funds, assets, or property for the benefit of someone else in such a manner that is not fair and reasonable; (3) whether Athena obtained funds from Plaintiff and the class members by deception with the intent to deprive Plaintiff and the class members of the use, benefit, or possession of the funds, assets, or property for the benefit of someone else in such a manner that is not fair and reasonable; and (4) whether Plaintiff and the class members suffered damages as a result of Athena's conduct.

153.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

154.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate class representative because her interests coincide with, and are not antagonistic to, the putative class members' interests. Plaintiff has retained experienced and competent counsel; she intends to continue to prosecute the action vigorously; she and her counsel will fairly and adequately protect

34

the interests of the members of the class; and she and her counsel have no interest that might cause them to not vigorously pursue this action.

155.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Athena's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

82.156.        The SAFE Act is remedial legislation that must be "construed and applied liberally to promote its purpose of deterring and remedying the financial exploitation of susceptible adults and older adults." Md. Code, Est. & Trusts § 13-608.

83.157.        As "personsa "person" under the SAFE Act, Defendants areAthena is prohibited from committing financial exploitation against susceptible adults and older adults.

84.    At all times relevant to this Complaint, Plaintiff was an "older adult" because she has been "at least 68 years old." Md. Code, Est. & Trusts § 13-601(i).

85.    The SAFE Act prohibits Defendants from financially exploiting older and susceptible adults in two ways relevant to the instant case.

35

86.158.        First, financialFinancial exploitation means an act taken by a person who "[s]tands in a position of trust and confidence with a susceptible adult or older adult and who knowingly obtains or uses, or endeavors to obtain or use, a susceptible adult's or older adult's funds, assets, or property with the intent to temporarily or permanently deprive the susceptible adult or older adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the susceptible adult or older adult, in such a manner that is not fair and reasonable." Md. Code, Est. & Trusts § 13-601(e)(i).

87.159.        "Position of trust and confidence" means "a relationship, whether formed by a formal or informal agreement between a susceptible adult or older adult and another person or recognized by a formal declaration or court order, in which: (1) A person is entrusted with the use or management of the property or assets of the susceptible adult or older adult, or the susceptible adult's or older adult's care; **or** (2) There is a special confidence or trust placed in a person who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the susceptible adult or older adult." Md. Code, Est. & Trusts § 13-601(j) (emphasis added).

160.    DefendantsAthena stood in a position of trust and confidence with Plaintiff and Class Membersthe class members because their relationship was : (i) relationships were formed by a formal agreement because ATM users consent to by virtue of Athena's Terms of Service. Furthermore, they are ; and, in any event (ii) Athena was entrusted with the use of older adult's assets because older adults insert their Plaintiff's and the class members' funds, which were expected to be exchanged and converted from cash into the machines with to Bitcoin following deposit.

88.    With respect to the belieffees that the money will be protected by the owners of the machines.

89.161.    DefendantsAthena charged and retained, Athena knowingly obtained money from Plaintiff and Class Membersthe class members with the intent to either temporarily or permanently deprive them of the funds. Defendants know that when customers convert cash to cryptocurrency and send it to another person's wallet, they are permanently deprived of the fundssame.

90.    Furthermore, Defendants possess the requisite intent because they could easily take more effective steps to deter, stop, and mitigate fraud yet choose not to do so. They know their action will cause that people like Plaintiff to be harmed for "the benefit of someone other than the susceptible adult or older adult."

91.162.    Defendants' schemeAthena's practice is neither fair nor reasonable because their inaction is calculated to boost their : (i) it profits from undisclosed fees at the expense of some of the most vulnerable residents of Maryland.; and (ii) does so notwithstanding that it is on notice that its BTMs are used primarily for fraudulent schemes and mostly against elders.

92.163.    Second, financialFinancial exploitation also means an act taken by a person who "[b]y deception, false pretenses, false promises, larceny, embezzlement, misapplication, conversion, intimidation, coercion, isolation, excessive persuasion, or similar actions and tactics, obtains or uses, or endeavors to obtain or use, a susceptible adult's or older adult's funds, assets, or property with the intent to temporarily or permanently deprive the susceptible adult or older adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the susceptible adult or older adult." Md. Code, Est. & Trusts § 13-601(e)(ii).

93. Defendants used deception, false pretenses, false promises, and similar actions and tacticsWith respect to obtain older adult's funds the fees that Athena charged and retained, Athena knowingly deceived Plaintiff and the class members with the intent to permanently deprive them of the funds for the benefit of fraudsters.

94.164. Defendants advertise their machines as secure yet take no meaningful steps to make that a reality. Defendants intentionally shroud their machines in a veil of security, creating a false pretense fees that the transaction is akin to others that older adults would be familiar with, like cashing a check at a grocery store, depositing cash with a banker teller, or using a legitimate ATMPlaintiff and the class members paid.

95. Defendants' machines request driver's licenses and/or Social Security numbers from customers. These requests create an illusion of security yet do nothing to stop the most common types of scams. These illusions play into the narratives of the fraudsters, who direct their unsuspecting victims to Athena ATMs with promises that the machines are "encrypted" and therefore safe from the fictional threat they have invented.

96. Despite these empty gestures toward security, Defendants knowingly refuse to enact any measures that would effectively intervene, mitigate, or deter the use of its ATMs in scams such as the one in this case.

97.165. Defendants' actions, representations, misrepresentations, violations, and intimidation have Athena's violative conduct has caused damages to Plaintiff and Class Membersthe class members.

98. Claims under the Maryland SAFE Act survive the death of the older adult. Md. Code, Est. & Trusts § 13-605(b)(2).

99. The statute of limitations under the Maryland SAFE Act is five years from the discovery of financial exploitation. Md. Code, Est. & Trusts § 13-607(a).

166. The Maryland SAFE Act allows Plaintiff and the class members are entitled to recover and seek compensatory damages, restitution, reasonable attorney's fees, and treble damages. Md. Code, Est. & Trusts § 13-606(c).

**COUNT TWO**
**NEGLIGENCE**
**(Against all Defendants)**

101. Plaintiff re-alleges and incorporates by reference the allegations set forth above, and further alleges:

102. Defendants are expressly aware of the risk of financial abuse and has made affirmations to the public and its customers that it "ensures safe and secure banking." Accordingly, Defendants have assumed a duty to Plaintiff and Class Members to take reasonable steps to prevent the financial exploitation of older adults taking place at Athena ATMs.

103. As a financial services company, Defendants also owed a statutory duty to be aware of Plaintiff's and Class Members' status, age, and risk of being victimized under its "Know Your Customer" Rule under the PATRIOT Act and, if it did so, would have recognized that Plaintiff and Class Members were victims.

104. Plaintiff and Class Members, as senior citizens, are well-recognized within the cryptocurrency industry as a target for elder financial abuse, even according to Athena's own website that displays a telephone number for the AARP's fraud watch helpline.

105. The transaction at issue in this case was atypical and replete with red flags suggesting a scam. Those red flags should have triggered an alert to Defendants because they

39

involved a seventy-five-year-old woman depositing $13,000 at an Athena ATM for the first time, into a Bitcoin wallet that belonged to someone else.

106. Defendants breached their duties to Plaintiff and the Class by negligently, recklessly, and knowingly failing to implement checks and procedures both at Athena ATMs and internally that would effectively intervene, mitigate, or deter the use of Athena ATMs in scams such as the one in this case.

107. Through their actions and inactions, Defendants participated in and materially aided in the financial exploitation of Plaintiff and the Class. Without Defendants' actions and failures, this exploitation would not have occurred.

108. Defendants' negligent, reckless, and knowing failure and refusal to implement appropriate and sufficient checks and procedures to intervene, mitigate, or deter the use of the Athena ATMs described above in the subject scam was a direct and proximate cause of Plaintiff and Class Members being scammed out of their money, while Defendants gained a profit as a direct result of the scam.

**COUNT THREE**
**PRODUCTS LIABILITY: DESIGN DEFECT**
**(Against all Defendants)**

109. Plaintiff re-alleges and incorporates by reference the allegations set forth above, and further alleges:

110. Defendants are manufacturers of a defective product and are liable for both negligence and strict liability claims of design defect.

111. Defendants are expressly aware of the risk of financial abuse and have made affirmations to the public and its customers that it "ensures safe and secure banking." Accordingly, Defendants have assumed a duty to take reasonable steps to prevent the financial exploitation of older adults at its Athena ATMs.

40

112. Defendants breached these duties to Plaintiff and Class Members by negligently, recklessly, and knowingly failing to implement checks and procedures both at its ATMs and internally that would effectively intervene, mitigate, or deter the use of its ATMs in scams such as the one in this case.

113. Specifically, Defendants were negligent in designing and manufacturing Athena ATMs 1) in a manner that facilitates financial exploitation of users; 2) without appropriate warnings or instructions that would prevent the financial exploitation of users; and 3) without appropriate fail safes to monitor use of the machine to prevent financial exploitation of users.

114. Defendants are capable of implementing effective and sufficient checks and procedures both at the Athena ATMs and internally that would intervene, prevent, mitigate, or deter the use of the Athena ATMs in scams such as the one in this case, but knowingly choose not to adopt effective checks or balances because doing so would thwart a substantial volume of their business and the profits they gain from every dollar inserted into the ATM.

115. The Bitcoin ATMs and their software programs are defectively designed because they allow criminals to easily use them to perpetrate financial scams. This defect is attributable to Defendants because they manufacture and operate the machines. The defect is causally related to the injuries suffered by Plaintiff and Class Members because criminals exploited the machines' design defects to steal money from Plaintiff and Class Members. The harm suffered by Plaintiff and Class members was reasonably foreseeable because Athena ATMs have become a known way for criminals to perpetrate fraud.

116. Turning to the elements of a design defect in strict liability, the Athena ATMs were in a defective condition at the time they left the possession or control of Defendants. The ATMs were unreasonably dangerous to consumers and the defect caused Plaintiff and Class Members'

41

injuries. Finally, the product was expected to and did reach Plaintiff and Class Members without substantial change in its condition. Thus, Defendants are strictly liable for the design defect.

117. As a direct and proximate result of Defendants' placing a defective and unreasonably dangerous product into the stream of commerce, Plaintiff and Class Members have suffered damages to their property in the form of loss of title to cash assets deposited into the machines.

**COUNT FOUR**
**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**
**Md. Code, Com. Law § 13-101, *et. seq.***
**(Against all Defendants)**

118. Plaintiff re-alleges and incorporates by reference the allegations set forth above, and further alleges:

119. Maryland's Consumer Protection Act ("CPA"), Md.        WHEREFORE. Code, Com. Law § 13-101, et seq., constitutes remedial legislation that is intended to be construed liberally in order to promote its purpose of providing a modicum of protection for the State's consumers. *Wash. Home Remodelers, Inc. v. State, Office of Attorney Gen., Consumer Prot. Div.*, 426 Md. 613, 630 (2012).

120. As "persons" under the CPA, Md. Code, Com. Law § 13-101(h), Defendants are prohibited from engaging in unfair and deceptive trade practices.

121. At all times relevant to this Complaint, Plaintiff and Class Members were consumers because they purchased and received consumer services, namely converting their personal assets into cryptocurrency.

122. The CPA specifically prohibits Defendants from making false statements which have the capacity of deceiving or misleading consumers and failing to state a material fact if the failure deceives or tends to deceive. Md. Code, Com. Law §§ 13-301(1) and (3).

42

123. Defendants knew or should have known that their Athena ATMs were not secure and could easily be used for financial exploitation.

124. Defendants did not inform Plaintiff and Class Members about material facts concerning the common ways that criminals use their Athena ATMs to perpetrate financial exploitation, except perhaps buried in a nonexplicit Terms of Service agreement they knew few, if any, victims would actually read.

125. Defendants did not inform Plaintiff and Class Members about material facts concerning their failure to implement checks and procedures both at its ATMs and internally that would effectively intervene, mitigate, or deter the use of its ATMs in scams such as the one in this case.

126. Defendants intended that Plaintiff and Class Members rely on Defendants' misrepresentations and concealment, suppression, or omission of the material facts regarding the use of their ATMs for financial exploitation and regarding their own inaction.

127. Plaintiff and Class Members would not have used the Athena ATMs had they known the machines were routinely used for financial exploitation and that Defendants had knowingly failed to implement checks and procedures both at its ATMs and internally that would effectively intervene, mitigate, or deter the use of its ATMs in scams such as the one in this case.

128. Because the material facts were withheld, Plaintiff and Class Members were deceived and were damaged as a result.

129. In violation of the CPA, Md. Code, Com. Law §§ 13-301(1), (2), and (3) and 13-303(1) and (2), Defendants failed to state material facts and knowingly concealed, suppressed, or omitted material information regarding the security of the Athena ATMs with the intent that Plaintiff and Class Members rely on same.

130. Named Plaintiffs and Class Members seek to recover damages and their attorneys' fees from Defendants.

**COUNT FIVE**
**DECLARATORY AND INJUCTIVE RELIEF**
**On Behalf of the Class**
**(Against all Defendants)**

131. Plaintiff re-alleges and incorporates by reference the allegations set forth above, and further alleges:

132. Named Plaintiff seeks a declaration individually and on behalf of the Class that Defendants are not entitled to manufacture and operate Athena ATMs without taking reasonable steps to effectively intervene, mitigate, or deter the use of its ATMs in scams.

133. Defendants should be ordered to disgorge all fees they collected from Class Members.

134. Defendants should be enjoined from manufacturing and operating Athena ATMs without taking reasonable steps to effectively intervene, mitigate, or deter the use of its ATMs in scams.

135. Defendants should be enjoined from profiting off their own inaction.

WHEREFORE, as to the claims set forth above, Plaintiff prays that the following relief be granted to the Named Plaintiff and the Class:

    A. The Court certify a class of persons as set forth herein or as may be amended, and appoint the Plaintiff as Class Representative and their counsel as Class Counsel;

    B. The Court order that Defendants pay to Named Plaintiff and members of the Class allactual, compensatory and, treble, and punitive damages, including by refunding all predatoryas well as her attorneys' fees Defendants charged;

    C. The Court enter an award ofand costs as pleaded above against Athena; for pre-judgementjudgment and post-judgment interest on all sums awarded to Named Plaintiff and members of the Class;

44

D. The Court award to Named Plaintiff and members of the Class reasonable counsel fees and the costs of these proceedings; and

E. The Court order such at the legal rate, and any other and further relief as the nature of this case may require.Court finds appropriate.

F. In order to comply with the Maryland Rules, the amount sought for damages is in excess of $75,000.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**PLAINTIFF**

By:    /s/ *Vaughn Stewart*Kristi C. Kelly
Vaughn Stewart, CFPF No.: 2305040018
Matthew Thomas Vocci, CFPF No.: 0612130424
Santoni, Vocci & Ortega, LLC
201 W. Padonia Road, Suite 101A
Lutherville-Timonium, Maryland 21093
Phone: 443-921-8161
Fax: 410-525-5704
vstewart@svolaw.com
*Attorneys for Named Plaintiff and Putative Class*

/s/
Kristi C. Kelly (Fed. Bar No. 07244)
J. Patrick McNichol (Fed. Bar No. 19034)
J. Patrick McNichol, CFPF No.: 1312180233
KELLY GUZZO, PLC

3953925 Chain Bridge Road, Suite 202

Fairfax, VA 22030

Phone:
Telephone: (703-) 424-7572
Fax: Facsimile: (703-) 591-0167
E-mail:
kkelly@kellyguzzo.com
E-mail : pat@kellyguzzo.com

*Attorney*

45

*Counsel* for ~~Named~~ Plaintiff ~~and Putative Class~~

## CLAIM FOR ATTORNEY'S FEES

~~Named Plaintiff reiterates that, as stated in the individual counts for relief, she intends to seek attorneys' fees pursuant to Maryland Rule 2-701, *et seq.*, and these fees may be substantial as litigation continues.~~

~~*/s/ Vaughn Stewart*~~
~~Vaughn Stewart, CFPF No.: 2305040018~~

## DEMAND FOR JURY TRIAL

~~Plaintiff, individually and on behalf of the Class Members, demands trial by jury.~~

~~*/s/ Vaughn Stewart*~~
~~Vaughn Stewart, CFPF No.: 2305040018~~

46